MEYERS LAW GROUP, P.C.
MERLE C. MEYERS, ESQ., CA Bar #66849
KATHY QUON BRYANT, ESQ., CA Bar # 213156
100 Shoreline Highway, Suite B160
Mill Valley, CA 94941
Telephone: (415) 362-7500
Facsimile: (415) 362-7515
Email: mmeyers@meyerslawgroup.com
        kquonbryant@meyerslawgroup.com

Counsel for Debtor-in-Possession (Admitted *pro hac vice*)

CAIRNCROSS & HEMPELMANN
JOHN R. RIZZARDI, ESQ., WA Bar # 9388
ADITI PARANJPYE, ESQ., WA Bar # 53001
524 2ND Avenue, Suite 500
Seattle, WA 98104
Telephone: (206) 587-0700
Facsimile: (206) 587-2308
Email: jrizzardi@cairncross.com
        aparanjpye@cairncross.com

Local Counsel for Debtor-in-Possession

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Case No. 23-12026-TWD |
| SALISH COAST ENTERPRISES, INC., dba SKAGIT VALLEY MALTING, | Chapter 11 |
| Debtor. | |

**DEBTOR'S DISCLOSURE STATEMENT  FOR PLAN OF LIQUIDATION**
**(Dated March 25, 2024)**

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

SALISH COAST ENTERPRISES, INC., doing business as SKAGIT VALLEY MALTING, the debtor-in-possession herein (the "Debtor"), hereby presents this disclosure statement (the "Disclosure Statement") for the purpose of providing parties in interest with information pertinent to the Debtor's Plan of Liquidation (as it may be amended or modified hereafter, the "Plan") filed on March 25, 2024 by the Debtor.

**ALL CREDITORS AND HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETIES BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED HERETO, EXHIBITS TO THE PLAN AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO OR CONCURRENT WITH THE FILING OF THIS DISCLOSURE STATEMENT. ALL CREDITORS AND HOLDERS OF CLAIMS IN THE DEBTOR'S CASES SHOULD READ CAREFULLY AND CONSIDER FULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN. THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE ESTATE HEREIN AND ALL OF ITS CREDITORS.**

**THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT, WHICH APPROVAL DOES NOT CONSTITUTE A DETERMINATION OF THE MERITS OF THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. THE APPROVAL OF THIS DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS AND HOLDERS OF CLAIMS IN THE DEBTOR'S ESTATE TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN.**

**THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN EXHIBITS ATTACHED HERETO IS WITHOUT ERROR, ALTHOUGH ALL REASONABLE EFFORTS UNDER THE CIRCUMSTANCES HAVE BEEN MADE TO BE ACCURATE. IN PARTICULAR, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE DEBTOR NOTES THAT THE ASSUMPTIONS AND PROJECTIONS REFERENCED HEREIN REGARDING FUTURE RESULTS, REVENUES AND INCOME OF THE POSTCONFIRMATION ESTATE, AND THE TIMING AND FEASIBILITY OF DISTRIBUTIONS TO CREDITORS, ARE ONLY PREDICTIONS OF FUTURE EVENTS, AND THEREFORE THERE CAN BE NO ASSURANCES THAT THE ASSUMPTIONS WILL IN FACT MATERIALIZE OR THAT THE PROJECTED EVENTS WILL IN FACT OCCUR AS PREDICTED.**

## INTRODUCTION

### A.    Filing of the Plan

The Debtor has filed the Plan and this Disclosure Statement with the above-captioned

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

Bankruptcy Court pursuant to the provisions of Section 1125 of the Bankruptcy Code, for distribution to holders of Claims[1] against, and Interests in, the assets of the Debtor, in connection with (i) the solicitation of acceptances of the Plan, and (ii) a hearing to consider confirmation of the Plan (the "Confirmation Hearing") to be scheduled by the Bankruptcy Court.

Attached as exhibits to this Disclosure Statement are copies of the following:

- The Plan (**Exhibit "A"**);

- The Order of the Bankruptcy Court approving this Disclosure Statement and establishing voting and tabulation procedures (**Exhibit "B"**);

- The Debtor's preference analysis (**Exhibit "C"**);

- The Debtor's liquidation analysis (**Exhibit "D"**);

- The Case Management Order entered by the Bankruptcy Court on October 30, 2023 (**Exhibit "E"**);

- Support Statement of Turner and Local Invest, secured lenders (**Exhibit "F"**); and

- Support Statement of the Port, lessor (**Exhibit "G"**).

In addition, accompanying this Disclosure Statement in the same package of materials is a ballot (the "Ballot") for the acceptance or rejection of the Plan for use by those holders of Claims that are entitled to vote to accept or reject the Plan.

After notice and a hearing, the Bankruptcy Court has approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors and interest holders to make an informed judgment whether to accept or reject the Plan. Each creditor and holder of a Claim or Interest in the Estate that is entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entireties before voting on the Plan.

**B.**     **Right to Vote on the Plan**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims in classes of claims that are impaired under the terms and provisions of a chapter 11 plan are entitled to vote to accept or reject that plan. Holders of allowed claims in classes of claims that are unimpaired under

---

[1] All capitalized terms not otherwise defined herein are intended to have the meanings ascribed to them in the Plan.

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

the terms and provisions of a chapter 11 plan are conclusively presumed to have accepted the Plan and therefore are not entitled to vote with respect to that plan. Holders of Claims within Classes A (Priority Claims) and B4 (Wells Fargo Equipment Loans) of the Plan are unimpaired, are conclusively presumed to have accepted the Plan, and therefore do not have the right to vote on the Plan. Holders of all Claims in Classes B1 (Turner Equipment Loan), B2 (Local Invest Grain Financing), B3 (Local Invest Bridge Loan), B5 (Innotech Claims) and C General Unsecured Claims) are impaired and therefore are entitled to vote to accept or reject the Plan. Claims and Interests in Classes D (Subordinated Claims), E1 (Preferred Shares) and E2 (Common Shares) will receive nothing under the Plan and are therefore conclusively presumed to have rejected the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount, and more than one-half in number, of claims within that class that cast ballots for acceptance or rejection of the plan. For a more complete description of the requirements for confirmation of the Plan, see Section V, "Confirmation and Consummation Procedure."

If a Class of Claims rejects the Plan or is deemed to reject the Plan, the Debtor has the right, and intends in this case, to request confirmation of the Plan pursuant to the "cram-down" provisions of Section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the confirmation of a plan notwithstanding non-acceptance by one or more impaired classes of claims or equity interests if the proponent thereof complies with the provisions of that section. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section V(C).1, "Confirmation and Consummation Procedure -- Unfair Discrimination and Fair and Equitable Tests."

The Debtor believes that through the Plan, creditors will obtain a greater recovery upon their claims than the recovery that would be available if the assets of the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Therefore, the Debtor believes that after reviewing the Plan and this Disclosure Statement, including the Exhibits, each holder of an Allowed Claim that is entitled to vote with respect to the Plan should vote to accept the Plan.

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

**C. Voting Instructions**

If you are entitled to vote to accept or reject the Plan, the Ballot is enclosed for the purpose of voting on the Plan. If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you may submit separate ballots that must be used for each separate Class of Claims. In any event, please vote and return your ballot(s) to:

> SKAGIT PLAN OF REORGANIZATION
> c/o Meyers Law Group, P.C.
> Attn: Kathy Quon Bryant, Esq.
> 100 Shoreline Highway, Suite B160
> Mill Valley, CA 94941
> Email: kquonbryant@meyerslawgroup.com
> Tel: (415) 362-7500, ext. 224
>
> Fax: (415) 362-7515

DO NOT RETURN YOUR NOTES OR SECURITIES WITH YOUR BALLOT. TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE TIME AND DATE STATED ON THE BALLOT.

If you are a creditor entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Kathy Quon Bryant, Esq., one of the Debtor's counsel, at (415) 362-7500, ext. 224.

**D. Confirmation Hearing**

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be commenced on the date set forth in documents provided with this Disclosure Statement before the Honorable Timothy W. Dore, United States Bankruptcy Judge, at the United States Bankruptcy Court located at 700 Stewart Street, 8th Floor, Seattle, Washington 98101. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before the deadline stated in such documents, in the manner described below in Section V(B), "Confirmation and Consummation Procedure -- The Confirmation Hearing." The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II. DESCRIPTION OF THE PLAN

### A. Introduction

The Plan is the product of extensive efforts by the Debtor, in consultation with its primary secured lenders and others, to formulate a plan that maximizes and speeds recoveries for general unsecured creditors, to be made as early as possible. Under the Plan, all Priority Claims and other Nonclassified Claims will be paid in full; and, subject to variables that cannot yet be quantified, roughly 10% of the amounts of Allowed General Unsecured Claims will be paid,[2] from payments to be made by the Debtor's primary secured lenders (the "Purchasers") in exchange for acquisition of most of the Debtor's assets, along with other consideration provided by the Purchasers. The Debtor understands that it is the Purchasers' intent to resume the Debtor's business with new capitalization and funding, upon acquiring the Debtor's assets. Thus, although the Plan is styled as a liquidation, it will effectively allow for the restart of the Debtor's enterprise in an entity owned by the Purchasers.

### B. Classification and Treatment of Claims

The Plan designates nine (9) Classes of Claims and Equity Interests. Those Classes take into account the differing nature and priority of the various kinds of classified Claims and Equity Interests under the Bankruptcy Code.

The following table briefly summarizes the classification and treatment of all Classes under the Plan. **The information set forth in the following table is a summary only for convenience of reference, and each holder of a Claim or Equity Interest should refer to the Plan for a full understanding of the classification and treatment of Claims provided for under the Plan.** The terms of the Plan (and not this Disclosure Statement) shall govern the treatment of Claims and Equity Interests asserted against the Debtor.

Claims and Equity Interests will receive designated treatment within a Class only to the extent Allowed within that class. The Claim allowance procedure is an ongoing process and the actual amount of Allowed Claims may vary from the estimates. For a complete description of the risks

---

[2] Those percentages may change depending on the outcome of any challenges to disputed claims and other factors.

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

associated with the recoveries provided under the Plan, see Section VI, "Certain Risk Factors To Be Considered."

| CLASS | CLAIMS OR INTERESTS | SUMMARY OF TREATMENT |
|---|---|---|
| Nonclassified | Administrative Expenses Other Than Professional Fees | Paid in full by the Purchasers on latest of (a) Effective Date; (b) when due; or (c) when allowed by Final Order. |
| Nonclassified | Professional Fees | Paid in full by the Purchasers upon Court approval. |
| Nonclassified | Priority Tax Claims | Paid in full by the Purchasers on latest of (a) Effective Date; (b) when due; or (c) when allowed by the Court if disputed. |
| Class A | Other Priority Claims | Paid in full by Purchasers on latest of (a) Effective Date; (b) when due; or (c) when allowed by the Court if disputed. |
| Class B1 | Secured Claim under Turner Equipment Loan | The Secured Claim will be released in partial consideration for the transfer of most of the Debtor's assets to the Purchasers. |
| Class B2 | Secured Claim under Local Invest Grain Financing | The Secured Claim will be released in partial consideration for the transfer of most of the Debtor's assets to the Purchasers. |
| Class B3 | Secured Claims under Local Invest Bridge Loan | The Secured Claim will be released in partial consideration for the transfer of most of the Debtor's assets to the Purchasers. |
| Class B4 | Secured Claims under Wells Fargo Equipment Loans | All obligations owing and due as of the Effective Date will be cured by the Purchaser, and all obligations due thereafter will be timely paid by the Purchasers. |
| Class B5 | Innotech Secured Claim | In full satisfaction of all Secured Claims held by Innotech, the Purchasers shall pay to Innotech the sum of $60,000.00 on the Effective Date, and Innotech shall make available to the Purchasers the machinery constructed on order from the Debtor. Innotech shall hold an Allowed Claim within Class C for the balance owed under its contract with the Debtor, in the amount of $57,842.00. |

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

| **CLASS** | **CLAIMS OR INTERESTS** | **SUMMARY OF TREATMENT** |
|---|---|---|
| Class C | Unsecured Claims | Each holder of an Allowed Claim in Class C will receive from the Debtor a *pro rata* share of funds in the amount of $20,000.00. The funds for such distribution will be provided by the Purchasers. As described elsewhere in this Disclosure Statement, the Debtor estimates that holders of Allowed Class C Claims will receive approximately 10% of their Claims, although no assurance of a particular percentage, whether within that range or higher or lower, can be given. |
| Class D | Subordinated Unsecured Claims | Holders of Subordinated Unsecured Claims, including any Claim arising under a *Simple Agreement for Future Equity*, will receive no payment or other distribution under the Plan. |
| Class E1 | Equity Interests – Preferred Shares | All existing shares of stock of the Debtor will be cancelled, and no distribution will be made thereon. |
| Class E2 | Equity Interests – Common Shares | All existing shares of stock of the Debtor will be cancelled, and no distribution will be made thereon. |

**C.    Material Elements of the Plan**

The following is a brief summary of certain of the material provisions of the Plan that allow for the distributions and treatments contemplated by the Plan. **This overview is a summary only, and is qualified in its entirety by reference to the provisions of the Plan itself,** a copy of which is annexed hereto as **Exhibit "A,"** as well as financial and other information contained elsewhere in this document and in the exhibits attached hereto.

1.    **Transfer of Assets to the Purchasers.** As of the Effective Date, substantially all assets of the Debtor and its Estate, other than Excluded Assets, will be assigned and transferred to the Purchasers, free and clear of any and all claims, interests, liens, security interests and obligations other than those that are expressly created or preserved by the provisions of this Plan or the Confirmation Order, without representation or warranty as to title, condition or use. In exchange, the Purchasers shall (a) waive any and all claims which they hold against the Debtor (which are secured

and are in an aggregate amount in excess of $5,200,000); (b) pay all Priority Claims and Administrative Expense Claims; (c) pay all Cures of assumed and assigned executory contracts; and (d) pay to the Debtor the sum of $20,000.00 to be distributed on account of Allowed Claims within Class C (General Unsecured Claims).

2. **Funding and Distributions.** With funds of $20,000.00 received from the Purchasers, the Debtor will make a *pro rat*a distribution to all holders of Allowed Claims within Class C. The distribution will occur as soon as possible after the Effective Date of the Plan, once all asserted claims within Class C have been resolved, by agreement or Court orders. The percentage of distributions on account of Allowed Claims in Class C will depend on the amount of Allowed Claims, once resolved by any necessary challenges to filed amounts, as well as other variables. With the caveat that none of those variables can be quantified at this time, the Debtor estimates that distributions on account of Allowed Claims within Class C will be roughly 10% of allowed amounts.

3. **Innotech Secured Claim**.

Innotech asserts a statutory lien, pursuant to RCWA § 60.08.010, against an unfinished malting machine owned by the Debtor and held by Innotech, to secure a claim of approximately $118,000. As a compromise and settlement of any Secured Claim held by Innotech, the Purchasers will pay to Innotech the sum of $60,000.00 on the Effective Date, and Innotech will release its lien, make the malting machine available for pickup by the Purchasers, and hold an Allowed Claim within Class C for the balance owing, in the amount of $57,842.00.

4. **Subordinated Debt**.

Class D consists of Subordinated Unsecured Claims, including any Claim arising under a *Simple Agreement for Future Equity* ("SAFE Claims"). No payment or other distribution will be made on account of Class D Claims. With respect to SAFE Claims in particular, because those Claims are expressly subordinated to all other General Unsecured Claims, they are classified separately from Class C in a junior position, and because Class C Claims will not be paid in full, Class D Claims will receive no distribution.

Under the terms of the SAFE Claims, the transactions contemplated by the Plan, pursuant to which substantially all of the Debtor's assets will be sold, constitute a Change of Control and, hence,

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

a Liquidity Event, as those terms are defined in the SAFE agreement. In such event, payment of SAFE Claims is expressly subordinated to "payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes."

In addition, SAFE Claims are subject to subordination under Section 510(b) of the Bankruptcy Code. *In re Tristar Experanza Prop., LLC*, 782 F.3d 492, at 495 (9th Cir. 2015) – Section 510(b) "reaches even ordinary breach of contract claims so long as there is a sufficient nexus between the claim and the purchase of securities." See also, *In re Lehman Bros. Holdings Inc.,* 855 F.3d 459 (2nd Cir. 2017), and *In re Betacom of Phoenix, Inc.*, 240 F.3d 823, at 828-829 (9th Cir. 2001). For this reason as well, SAFE Claims must be separately classified in a class junior to Class C, General Unsecured Claims.

5. **Equity Interests**.

Insofar as the Debtor will have insufficient funds to satisfy Allowed Claims in Classes C and D in full, no distribution can be made on account of Equity Interests. Accordingly, no payment or other distribution will be made to holders of Equity Interests, whether Preferred Shares or Common Shares.

6. **Causes of Action Discharged**. Any and all causes of action or claims held by the Debtor as of the Effective Date, including any claims for avoidance of transfers under the provisions of Sections 542 *et. seq*. of the Bankruptcy Code, shall be deemed waived, released and discharged.

7. **Exculpation.** The Purchasers and the Debtor and their respective professionals, officers, directors and representatives, shall neither have nor incur any liability to any person or entity for any act taken or omitted to be taken, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, confirmation or consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Case up to and including the Effective Date, other than if arising from gross negligence or willful misconduct.

**D.** **Recommendation as to Plan**

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST AND

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

EARLIEST POSSIBLE RECOVERIES TO HOLDERS OF ALL GENERAL UNSECURED CLAIMS, AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF SUCH CLAIMS. THE DEBTOR THEREFORE RECOMMENDS ACCEPTANCE OF THE PLAN BY ALL SUCH CLAIMANTS.

## III. INFORMATION REGARDING THE CHAPTER 11 ESTATE

The following information is provided in summary form with respect to the Debtor, its chapter 11 estate, and related topics:

### A. Events Leading to Commencement of Chapter 11 Case

The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 20, 2023 (the "Petition Date"). The Debtor continues to operate its business as a debtor-in-possession pursuant to the provisions of Sections 1107(a) and 1108 of the Bankruptcy Code, no trustee having been appointed.

The Debtor, founded in 2011, is incorporated under the laws of the State of Washington, and operates from its principal place of business located in Burlington, Washington. The Debtor operates a grain processing business, purchasing locally grown grain, primarily barley, and producing malt from that grain. The malt is then sold to craft brewing and craft distilling companies, with customers primarily located on the West Coast, from Vancouver, British Columbia to San Diego, California. In purchasing its grain locally, the Debtor provides significant value to local grain producers by buying inventory at prices higher than otherwise available in the commodity market, making what is customarily a cover crop with minimal value into a valuable cash crop.

As part of its processing, the Debtor has developed a controlled germination (malting) system that has been awarded a U.S. patent. This unique system was designed and built by the company's team, and the single-vessel malting system is the first of its kind. It is capable of malting a wide variety of grains otherwise considered un-maltable. The Debtor is uniquely positioned to leverage its technology and access to local grains to provide malt products to its customers, and is leading its industry as the first regenerative and sustainable craft maltster fully integrated and supported from farm to glass.

Until 2020, the Debtor's annual revenues grew rapidly, from approximately $780,000 in 2017

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

to roughly $2,300,000 in 2019. However, the COVID-19 pandemic had a significant adverse impact on the company: The Debtor's primary customers, craft breweries and distilleries, relied heavily on on-premises sales that were prohibited during the early months of COVID restrictions. As a result, the Debtor's revenues declined approximately 23% in 2020, to $1,800,000. In addition, lower customer demand resulted in a surplus of raw material in the Debtor's inventory, causing grain to exceed its shelf life and forcing the Debtor to sell inventory at a loss.

In response, the Debtor curtailed operations, cut wages and implemented layoffs and other cost reductions. Also, in order to stabilize cash flow, the Debtor obtained operating loans and negotiated rent deferments with its landlord, the Port of Skagit, and deferred payment to its leading grower. While those measures were successful in raising operating capital in the near term, they created a heavy debt burden that now restricts the Debtor's ability to operate successfully and to grow.

As the impacts of the pandemic have since eased and revenues have begun to recover, the company's growth has not materialized at the pace expected, and profitability has not yet been achieved. As a result, in June 2023, the Debtor was forced to suspend its operations and lay off virtually all of its workforce other than a skeleton crew. Since that time, the Debtor has explored multiple sources for funding, either as financing or new capital, without success until recently.

In April and September 2023, following negotiations and shared budgeting, the Debtor obtained new advances from its existing secured lenders, first for the purpose of providing additional working capital while negotiating out-of-court debt restructuring, and then, when those efforts proved unsuccessful, for commencing this chapter 11 case and restructuring the Debtor's debt through a plan of reorganization. As part of that funding, the Debtor and its secured lenders reached agreement on the main elements of a plan in which the lenders' secured debt would be converted into equity and the Debtor would be reorganized with a new capital and debt structure.

Subsequently, the lenders reversed their agreement to those terms and instead proposed a sale of substantially all of the assets of the Debtor to the lenders, in exchange for a cancellation of the lenders' secured debt.[3] Further negotiations resulted in this Plan, which has the lenders' express

---

[3] Nothing herein is intended to waive or release any claims that the Debtor may hold against the lenders for conduct

support, as evidenced by their support statement attached hereto as **Exhibit "F."**

## B. Knutzen

In order to purchase grain from Knutzen Farms, L.P. ("Knutzen") in 2021 and thereafter, the Debtor executed a promissory note in favor of Knutzen in the original principal amount of $277,663.87. The note became due on March 31, 2023 but was not paid at that time. Knutzen asserted a producer's lien to secure all amounts owing under the note, pursuant to RCW 60.13.020 and 60.13.020, against all inventory and accounts receivable of the Debtor, regardless of whether derived from grain purchased from Knutzen. The Debtor acknowledged Knutzen's lien against inventory and accounts receivable arising from Knutzen's sold grain, but not as to other assets. Knutzen filed a UCC-1 financing statement to secure its alleged lien on April 19, 2023.

The Debtor and Knutzen reached two settlement agreements in 2023, resolving all disputes and claims between them. On or about August 11, 2023, under the first of those agreements, the Debtor paid to Knutzen $50,000 in exchange for a release of all undisputed liens, i.e., liens against Knutzen-derived collateral. On or about September 23, 2023, under the second of those agreements, the Debtor paid to Knutzen $175,000 in exchange for release of all remaining claims and alleged liens, thereby resolving all claims between the parties (including a $6,997.05 owing to the Debtor). At the time of the second compromise, Knutzen asserted a secured claim in the amount of $246,427.89, which claim was released upon receipt of the $175,000 payment.

## C. Port of Skagit

Until recently, the Debtor was the lessee under two real property leases with the Port of Skagit County (the "Port"), (a) one for property located at 11749 Westar Lane, Burlington, WA, where the Debtor uses silos for storage of grain (the "Silo Facility Lease"), and (b) the other for property located at 11966 Westar Lane, Burlington, WA, where the Debtor maintains its offices and malting machines (the "Malting Plant Lease"). Under both agreements, the Debtor was in default of its rent obligations but had been given an informal deferral of payment dates by the Port.

However, in or about July 2023, the Port issued a notice to quit the premises under the Silo

---

regarding plan negotiations or related matters. However, as of the Effective Date all such claims will be deemed waived and released, along with all other claims of the Estate.

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

Facility Lease. The Debtor entered into discussions with the Port, resulting in execution of a fourth and final amendment of the lease whereunder the lease was terminated, rent ceased to accrue (but the Port maintained a claim for all unpaid rent coming due prior thereto), and under certain conditions, the Debtor was authorized to continue to store grain on the premises although no longer a tenant. Since then, the Debtor has reached agreement with the replacement tenant, Cairnspring Mills, that allows the Debtor to continue to utilize the silos on a fee basis.

According to a proof of claim filed by the Port, the Port asserts a claim for unpaid rent under the terminated Silo Facility Lease in the amount of $1,112,289.87, and a claim for unpaid rent under the Malting Plant Lease in the amount of $211,170.23, as of the Petition Date.

Under the terms of the Plan, the Malting Plant Lease will be rejected by the Debtor and the Port will waive any and all claims under either the Malting Plant Lease or the Silo Facility Lease. In exchange, the Debtor will transfer and assign to the Port certain equipment and other personal property owned by the Debtor and situated on the premises of the Silo Facility Lease. It is expected that the Purchasers will enter into a new lease with the Port regarding the malthouse and office space, in order to continue business operations therein. The Port has agreed to those terms, including the waiver of claims by the Port against the Debtor's estate, as evidenced by the support agreement provided by the Port and attached hereto as **Exhibit "G."**

**D.      Possible Preferential Transfers**

Prior to the Petition Date, the Debtor made transfers to creditors for services and products. All such payments were made for adequate consideration, and most or all were made in the ordinary course of business. Attached hereto as **Exhibit "C"** is a chart of all such payments made to non-insider payees within 90 days prior to the Petition Date, and all such payments made to insider payees within one year prior to the Petition Date.

Section 547 of the Bankruptcy Code provides for the disallowance of such transfers to the extent that they were not made in the ordinary course of business, or made substantially contemporaneously with value received, or offset by subsequent new value received by the Debtor, among other defenses. If the Debtor's case were to be converted to a chapter 7 liquidation, a chapter 7 trustee might choose to pursue recovery of certain of the payments, subject to defenses raised by

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

prospective defendants. **Exhibit "C"** contains an analysis of such pursuits, estimating that any net recovery in that hypothetical event would be no greater than $50,000, and probably less, after legal costs and settlement discounts.

E.     **Debtor's Assets and Liabilities**

     1.     As of the Petition Date, the Debtor's primary assets included the following:

     (a)     Eight malting machines and related equipment (the "Machines"), whose aggregate book value at cost is $3,911,428, but whose value in liquidation would be materially less;

     (b)     Patents, trademarks, know-how and malting recipes (the "IP") with an unknown value;

     (c)     Cash in the approximate amount of $333,313;

     (d)     Deposits and prepayments in the approximate amount of $81,867;

     (e)     Accounts receivable in the approximate amount of $35,800 (subject to limited collectability);

     (f)     Grain inventory (raw material), with an estimated retail value of $675,190 (and again, of materially less value in the event of liquidation);

     (g)     Grain inventory (finished material), with an estimated retail value of $286,348 unless in liquidation; and

     (h)     Other miscellaneous equipment, supplies and furniture of undetermined value.

     2.     The Debtor's primary debts as of the Petition Date consisted of the following:

     (a)     An equipment loan owed to Evan Turner in the approximate amount of $3,155,431, secured by a first lien on seven of the Machines;

     (b)     A grain finance loan owed to Local Invest 348d I, LLC ("Local Invest"), of which Mr. Turner is a principal, in the approximate amount of $667,646, secured by a lien on all grain inventory and proceeds;

     (c)     Interim bridge loans owed to Local Invest in the approximate amount of $1,191,890, secured by a first lien on one of the Machines and intellectual property, and a second lien on all other assets;

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

(d) Deferred rent owing to the Port of Skagit on an existing lease and a terminated lease, in the approximate aggregate amount of $1,303,303;

(e) Accounts payable in the approximate amount of $237,000; and

(f) Contingent, subordinated and unsecured debt, the SAFE Claims, of approximately $810,000, under multiple *Simple Agreements for Future Equity*, if triggered under certain circumstances.

## IV. SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

The following is a brief description of some of the major events that have occurred during the Chapter 11 Case.

### A. Operation of Business by Debtors-in-Possession

Since the commencement of the Chapter 11 Case, the Debtor has operated and managed their assets as debtors-in-possession under the protection of the Bankruptcy Court, pursuant to Sections 1107 and 1108 of the Bankruptcy Code. An immediate effect of the commencement of the chapter 11 cases was the imposition of the automatic stay under Section 362(a) of the Bankruptcy Code, which, with limited exceptions, enjoins the commencement or continuation of all prepetition litigation against, and efforts to collect funds from, the Debtors or their property. This injunction remains in effect unless and until modified or lifted by order of the Bankruptcy Court.

### B. Bankruptcy Schedules and Statements of Financial Affairs

On October 20, 2023, concurrently with filing its petition, the Debtor filed its *Schedules of Assets and Liabilities and Statement of Financial Affairs*, identifying all assets and liabilities of the estate as of the Petition Date and other information regarding the Debtor's financial condition and affairs.

### C. Representation of the Debtors

Under applicable provisions of the Bankruptcy Code, the Debtors are entitled to retain needed professionals, subject to approval by the Bankruptcy Court. Those professionals' compensation and reimbursement of costs must be paid from funds of the Debtors' estate and are treated as administrative expenses, unless other arrangements are made with Bankruptcy Court approval. In the Chapter 11 Case to date, the Debtor has retained the law firm of Meyers Law Group, P.C. as its

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

general bankruptcy counsel, and Cairncross & Hempelmann as its local counsel.

**D.      Claims Deadlines**

The Bankruptcy Court established December 19, 2023 as the last date for filing Claims in the Chapter 11 Case ("Claims Bar Date").

**E.      Case Management Order**

On October 30, 2023, the Bankruptcy Court entered a Case Management Order, a copy of which is attached hereto as **Exhibit "E."**  Under the terms of that Order, notice of most motions, applications, hearings and other events will be served only upon certain parties in interest, including those parties who request special notice pursuant to the procedures identified in the Order.  This Disclosure Statement and the Plan have been served upon all such parties, and also upon holders of timely-filed proofs of claim and claims listed in the Debtor's schedules as noncontingent, undisputed and liquidated.

**V.      CONFIRMATION AND CONSUMMATION PROCEDURE**

**A.      Solicitation of Votes**

In accordance with the provisions of Sections 1126 and 1129 of the Bankruptcy Code, the Claims in Classes B1, B2, B3 and C are impaired and the holders of Claims in those Classes are entitled to vote to accept or reject the Plan.  The holders of Allowed Claims in Classes A and B4 are unimpaired, and are conclusively presumed to have accepted the Plan and therefore are not entitled to vote, under Section 1126(f) of the Bankruptcy Code.  The holders of Claims and Equity Interests in Classes D, E1 and E2 will receive or retain nothing under the Plan are therefore conclusively presumed to have rejected the Plan and are not entitled to vote, under Section 1126(g) of the Bankruptcy Code.

As to those classes of Claims entitled to vote to accept or reject the Plan, the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class that have been timely voted.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any creditor in Classes B1, B2, B3 or C (i) whose Claim has been listed by the Debtors in their schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated) or (ii) who filed a proof of claim within any applicable period of limitations, or with leave of the Bankruptcy Court, which Claim is not the subject of an objection, is entitled to vote to accept or reject the Plan.

**B.**     **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Confirmation Hearing with respect to the Plan will be conducted before the Honorable Timothy W. Dore, United States Bankruptcy Judge, at the United States Bankruptcy Court located at 700 Stewart Street, 8th Floor, Seattle, Washington 98101, on a date, time and manner set forth in documents accompanying this Disclosure Statement. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice except for an announcement of the continued date made at the Confirmation Hearing.

Section 1128(b) provides that any party in interest may object to confirmation of a plan. Any objection to confirmation must be made in writing and filed with the Bankruptcy Court and served upon those parties identified for such service in other documents accompanying this Disclosure Statement. Objections to confirmation of the Plan are governed by Bankruptcy Rules 3017 and 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.**     **Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are (a) that the plan is accepted by all impaired classes of claims or, if rejected by an impaired class, (b) that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, is feasible, and is in the "best interests" of creditors which are impaired under the plan.

**1.**     **Unfair Discrimination and Fair and Equitable Tests**

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan does not discriminate unfairly and is fair and equitable with respect to each

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code establishes "cram down" tests for secured creditors and unsecured creditors as follows:

**a.** **Secured Creditors.**  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds is provided in clause (i) or (ii) of this subparagraph.

**b.** **Unsecured Creditors.**  Either (i) each impaired unsecured creditor receives or retains under the plan property of value equal to the amount of its allowed claim or (ii) the holders of claims that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

The Debtor believes that the Plan and the treatment of all Classes of Claims under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

**2.** **Feasibility**

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  Insofar as most distributions to creditors will occur on the Effective Date from funds supplied by the Purchasers, without which the Plan will not become effective, the Debtor submits that performance of Plan obligations is assured and feasible.

**3.** **Best Interests of Creditors**

With respect to each impaired Class of Claims, confirmation of the Plan requires that each holder of an Allowed Claim either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the debtors' assets were liquidated under chapter 7 of the Bankruptcy Code.  To determine what holders of Allowed Claims of each impaired Class would receive if the Debtors' assets were

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA  94941

liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from that liquidation in the context of a chapter 7 liquidation case. The cash amount which would be available for satisfaction of unsecured claims would consist of the proceeds resulting from the disposition of the unencumbered assets of the estate, augmented by the unencumbered cash held by the chapter 7 trustee at the time of the commencement of the liquidation case. Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

In this Chapter 11 Case, the Debtor believes that the Plan is likely to produce a greater and prompter recovery for general unsecured creditors than a chapter 7 liquidation of the Estate, and in fact that in such a liquidation, general unsecured creditors would likely receive no distribution at all.

The Debtor's liquidation analysis is attached hereto as **Exhibit "D."** As set forth in that analysis, because the Secured Lenders' collateral consists of virtually all assets of the Debtor's estate, liquidation of all inventory, equipment, intellectual property, accounts receivable and cash would leave no net proceeds for other creditors. This would leave only causes of action resulting from the commencement of the Chapter 11 Case, such as claims to avoid preferential payments to creditors.[4] However, as to such claims, as set forth in **Exhibit "C,"** net recoveries from prosecution of such claims would be very limited, and ultimately less than the administrative expenses and priority claims that are senior to Class C Claims. In addition, the chapter 7 liquidation would result in additional administrative expenses, including those of the chapter 7 trustee and retained professionals, which would eliminate the benefit of any net avoidance recoveries in any event. Lastly, the amount of Class C Claims would materially increase, as certain claims (including claims by the Port that exceed $1,300,000) that will be paid or settled under the Plan's terms would instead be asserted as unpaid claims, and as Secured Claims would likely become general unsecured claims to the extent of deficiency amounts after resort to collateral, adding to the amount of general unsecured claims. Based on that analysis, the Debtor believes that a chapter 7 liquidation would result in no recovery

---

[4] There might also exist claims against the Debtor's secured lenders, but at this time they would be too conjectural to assess or quantify.

DEBTOR'S DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
32935.DOC 20175

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

for general unsecured creditors.

In contrast to this, the Debtor believes that implementation of the Plan will lead to a recovery of roughly 10% for unsecured creditors, depending on the amount of Allowed Claims, although no assurances can be provided in that regard. By that estimation, recoveries will be greater under the Plan and the best interests test is satisfied. That estimate is based on the following: (a) scheduled and filed Unsecured Claims, reduced to amounts that the Debtor believes are likely owing, are in the aggregate, approximate amount of $5,500,000; (b) that amount is reduced by subordinated claims within Class D, and cure and deficiency claims waived or satisfied under the Plan, and rejection damage claims waived under the Plan, in an aggregate amount between $5,280,000 and $5,320,000; and (c) this leaves a net amount of Claims with in Class C in a range between $180,000 and $220,000, of which $20,000 is from 9.1% to 11.1%, or approximately 10%.

For this reason, the Debtor believes that the Plan will produce a better and faster recovery for creditors than a chapter 7 liquidation, and that the "best interests" test described above is therefore satisfied by the terms of the Plan.

**D. <u>Consummation</u>**

The Plan will be consummated following the Effective Date, which will be a date shortly following entry of the Confirmation Order, absent a stay of implementation.

**E. <u>Effect of Confirmation of the Plan</u>**

Confirmation and effectuation of the Plan will bind the Debtor, all creditors and all other parties in interest to the provisions of the confirmed Plan, whether or not the claim of such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan. Nothing contained in the Plan will limit the effect of Confirmation as described in Section 1141 of the Bankruptcy Code.

## VI. <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

**THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**A.      Certain Bankruptcy Law Considerations**

**1.      Risk of Non-Confirmation of the Plan**

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate the re-solicitation of votes.

**2.      Risk of Greater Unsecured Claims or Administrative Costs**

Unsecured claims may be allowed in amounts greater than projected and reported in this Disclosure Statement.  For example, claims disputed by the Debtor may ultimately be allowed in amounts greater than zero.  If that occurs, the Allowed Claims within Class C will increase and percentage distributions to holders of each such claim will be reduced proportionately.

**3.      Non-Consensual Confirmation**

In the event one or more impaired Classes of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request, if all other conditions for confirmation have been met and at least one impaired Class has accepted the Plan and, as to each impaired Class that has not accepted the Plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting impaired classes. The Debtor believes that the Plan satisfies those requirements.

**4.      Tax Attributes of the Plan**

The Debtor will not seek a ruling from the Internal Revenue Service prior to the Effective Date with respect to any of the tax aspects of the Plan.  EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS OR HER TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

**B.      Certain Practical Considerations**

LAW OFFICES
MEYERS LAW GROUP, P.C.
100 SHORELINE HIGHWAY, SUITE B160
MILL VALLEY, CALIFORNIA 94941

The valuations and projections used herein are based on the estimates of the Debtor and its advisors. Those estimates are a reflection of the Debtor's best subjective valuations, but cannot be assured as to the actual outcome.

## VII. CONCLUSION AND RECOMMENDATION

Based upon the foregoing, the Debtor believes that confirmation and implementation of the Plan is in the best interests of creditors, and should therefore be accepted by all classes of creditors entitled to vote on the Plan.

DATED: March 25, 2024

SALISH COAST ENTERPRISES, INC., dba
SKAGIT VALLEY MALTING


    /s/ Dave Green
    Dave Green, C.E.O.

Submitted by:

MEYERS LAW GROUP, P.C.

By:   /s/ Merle C. Meyers
       Merle C. Meyers, Esq., CA Bar #66849
       Kathy Quon Bryant, Esq., CA Bar #213156
100 Shoreline Highway, Suite B160
Mill Valley, CA 94941
Telephone: (415) 362-7500
Facsimile: (415) 362-7515
Email: mmeyers@meyerslawgroup.com
         kquonbryant@meyerslawgroup.com

General Bankruptcy Counsel for Debtor
Admitted *Pro Hac Vice*

-and-

CAIRNCROSS & HEMPELMANN, P.S.

By:   /s/ Aditi Paranjpye
       Aditi Paranjpye, WSBA No. 53001
524 Second Avenue, Suite 500
Seattle, WA 98104-2323
Telephone: (206) 587-0700
Facsimile: (206) 587-2308
Email: aparanjpye@cairncross.com

Local Counsel for Debtor

**Exhibit "A"**


**[TO BE ADDED]**


**Debtor's Plan of Liquidation filed March 25, 2024**

**Exhibit "B"**


**[TO BE ADDED]**


**Order of the Bankruptcy Court Approving Disclosure Statement for
Debtor's Plan of Liquidation filed March 25, 2024**

# EXHIBIT "C"

## PREPETITION PAYMENTS

(within 90 days (non-insiders) or one year (insiders), excluding payments under $5,000 cumulatively per recipient)

| Item | Recipient | Invoice Date | Service Period | Payment Date | Amount | Comments |
|---|---|---|---|---|---|---|
| 1. | Brown & Brown | 7-31-23 | Purchase of insurance policy tail, excess liability | 7-31-23 | 16,336.00 | Premiums paid contemporaneously |
| 2. | Brown & Brown | 7-27-23 | Purchase of insurance policy tail, general liability | 7-31-23 | 19,270.00 | Premiums paid contemporaneously |
| 3. | Cairncross & Hempelmann, P.S. | 4/24/23 | Advance Retainer | 4-27-23 | 3,000.00 | Legal fees paid in advance. |
| 4. | Cairncross & Hempelmann, P.S. | 6-14-23 | Retainer replenishment | 6-15-23 | 560.00 | Legal fees paid in advance. |
| 5. | Cairncross & Hempelmann, P.S. | 7-18-23 | Advance Retainer | 7/20/23 | 6,500.00 | Legal fees paid in advance. |
| 6. | Cairncross & Hempelmann, P.S. | 8-31-23 | Advance Retainer | 9-14-23 | 10,000.00 | Legal fees paid in advance. |
| 7. | Cascade Nat. Gas | 7-31-23 | 6-28-23 to 7-28-23 | 9-8-23 | 101.99 | Ordinary course payment |
| 8. | Cascade Nat. Gas | 8-28-23 | 7-29-23 to 8-25-23 | 9-8-23 | 183.80 | Ordinary course payment |
| 9. | Cascade Nat. Gas | Various | June 2023 | 9-8-23 | 8,501.99 | Of this amount, $7,219.31 was overdue. |
| 10. | Cascade Nat. Gas | 9-28-23 | 8-26-23 to 9-27-23 | 10-19-23 | 61.99 | Ordinary course payment |

32957_1.DOC

| Item | Recipient | Invoice Date | Service Period | Payment Date | Amount | Comments |
|------|-----------|--------------|----------------|--------------|--------|----------|
| 11. | Companion Life | N/A | N/A | 8-31-23 | 4,136.09 | Past-due premiums |
| 12. | Companion Life | 8-21-23 | May-June 2023 | 9-1-23 | 2,013.86 | Dental insurance premium |
| 13. | Dave Green, C.E.O. | Various | 10-20-22 to July 2023 | Various | 146,803.28 | Salary and expense reimbursements paid in ordinary course. |
| 14. | Dave Green, C.E.O | 8-4-23 | August 2023 | 8-7-23 | 11,600.00 | Consulting fee paid contemporaneously. |
| 15. | Dave Green, C.E.O. | 9-12-23 | September 2023 | 9-14-23 | 20,000.00 | Consulting fee paid contemporaneously. |
| 16. | Dave Green, C.E.O. | 10-1-23 | October 2023 | 10-3-23 | 20,000.00 | Consulting fee paid contemporaneously. |
| 17. | Emily Baker, VP Finance | Various | 10-20-22 to 7-31-23 | Various | $80,117.75 | Salary and expense reimbursements paid in ordinary course. |
| 18. | Erik Youngren, VP Sales and Marketing | Various | 10-20-22 to 7-31-23 | Various | $100,672.08 | Salary, consultant fees and expense reimbursements paid in ordinary course. |
| 19. | Kathi Lentzsch, Dir. | 3-24-23 | Jan – Mar 2023 | 3-24-23 | 60,000.00 | Consulting fee of $20,000.00 paid in arrears, $10,000.00 paid contemporaneously. |
| 20. | Kathi Lentzsch, Dir. | 5-1-23 | May 2023 | 5-5-23 | 20,000.00 | Consulting fee paid contemporaneously. |
| 21. | Kathi Lentzsch, Dir. | 6-6-23 | June 2023 | 6-7-23 | 20,000.00 | Consulting fee paid contemporaneously. |
| 22. | Kathi Lentzsch, Dir. | 7-5-23 | July 1-15, 2023 | 6-27-23 | 10,000.00 | Consulting fee paid in advance. |
| 23. | Kathi Lentzsch, Dir. | 7-5-23 | July 16-31, 2023 | 8-7-23 | 10,000.00 | Invoice misdated, may be ordinary course. |

2

| Item | Recipient | Invoice Date | Service Period | Payment Date | Amount | Comments |
|---|---|---|---|---|---|---|
| 24. | Kathi Lentzsch, Dir. | 9-12-23 | 8-1-23 to 10-31-23 | 9-14-23 | 30,000.00 | Consulting fee, $10,000 paid in ordinary course, $20,000 paid in advance. |
| 25. | Knutzen Farms LP | Note due 3-31-23 | 2021 | 8-14-23 | 50,000.00 | Paid in exchange for release of undisputed lien of approximately $50,000 |
| 26. | Knutzen Farms LP | 2021 | 2021 | 9-25-23 | 87,500.00 | Paid as compromise of disputed lien of $246,427.89 |
| 27. | Knutzen Farms LP | | 2021 | 9-26-23 | 87,500.00 | |
| 28. | Lee & Hayes PC | 7-20-23 | Mar–June 2023 | 7-26-23 | 36,927.00 | Legal fees paid in arrears, upon invoicing. |
| 29. | Lee & Hayes PC | 8-1-23 | Advance retainer | 8-2-23 | 7,500.00 | Legal fees paid in advance. |
| 30. | Lee & Hayes PC | 9-14-23 | Advance retainer | 9-14-23 | 5,000.00 | Legal fees paid in advance. |
| 31. | Meyers Law Group, P.C. | 3-14-23 | Fixed fee | 3-15-23 | 15,000.00 | Legal fees paid contemporaneously. |
| 32. | Meyers Law Group, P.C. | 3-24-23 | Advance retainer | 3-27-23 | 30,000.00 | Legal fees paid in advance. |
| 33. | Meyers Law Group, P.C. | 4-5-23 | Retainer replenishment | 4-13-23 | 27,023.83 | Legal fees paid in advance. |
| 34. | Meyers Law Group, P.C. | 4-26-23 | Fees earned, and retainer replenishment | 5-3-23 | 40,369.26 | $10,369.26 paid for legal services earned, balance for legal fees paid in advance. |
| 35. | Meyers Law Group, P.C. | 7-17-23 | Fixed fee | 7-14-23 | 30,000.00 | Legal fees paid contemporaneously. |
| 36. | Meyers Law Group, P.C. | 8-31-23 | Advance retainer | 9-13-23 | 100,000.00 | Legal fees paid in advance. |

32957_1.DOC

3

| Item | Recipient | Invoice Date | Service Period | Payment Date | Amount | Comments |
|---|---|---|---|---|---|---|
| 37. | Mutual of Enumclaw | 7-11-23 | 2023 commercial insur. | 7-26-23 | 355.83 | Premiums paid in ordinary course. |
| 38. | Mutual of Enumclaw | 6-13-23 | 2023 commercial insur. | 7-26-23 | 2,537.61 | Premiums paid in ordinary course. |
| 39. | Mutual of Enumclaw | 8-15-23 | 2023 commercial insur. | 9-13-23 | 1,026.50 | Premiums paid in ordinary course. |
| 40. | Mutual of Enumclaw | 8-15-23 | 2023 commercial insur. | 9-13-23 | 4,927.87 | Premiums paid in ordinary course. |
| 41. | Mutual of Enumclaw | 9-12-23 | 2023 commercial insur. | 9-14-23 | 2,463.93 | Premiums paid early. |
| 42. | Puget Sound Energy | 8-14-23 | 7-13-23 to 8-11-23 | 8-7-23 | 1,000.00 | Electric bill paid in ordinary course and partially in advance. |
| 43. | Puget Sound Energy | 8-21-23 | 7-13-23 to 7-23-23 | 9-8-23 | 4,500.00 | Electric bill paid in ordinary course and partially in advance. |
| 44. | Puget Sound Energy | 8-09-23 | 7-13-23 to 7-23-23 | 9-22-23 | 2,039.83 | Paid in ordinary course. |
| 45. | Wells Fargo Equip. Finance | N/A | Forklift lease payment | 9-12-23 | 2,103.48 | Paid late. |
| 46. | Wells Fargo Equip. Finance | N/A | Forklift lease payment | 9-12-23 | 3,014.74 | Paid late. |
| 47. | Wells Fargo Equip. Finance | N/A | Forklift lease payment | 9-28-23 | 550.91 | Paid in ordinary course. |
| 48. | Wells Fargo Equip. Finance | N/A | Forklift lease payment | 9-28-23 | 550.91 | Paid in ordinary course. |
| 49. | Robert Hedequist, Pres. and Chief Development Off. | Various | 10-20-22 to 6-15-23 | Various | $85,670.40 | Salary and expense reimbursements paid in ordinary course. |

| Item | Recipient | Invoice Date | Service Period | Payment Date | Amount | Comments |
|------|-----------|--------------|----------------|--------------|--------|----------|
| 50. | William Redding, VP Operations and Engineering | Various | 10-20-22 to 6-30-23 | Various | $103,984.56 | Salary and expense reimbursements paid in ordinary course. |
| 51. | Williams & Nulle, C.P.A. | 8-30-23 | Various | 9-11-23 | 7,550.00 | Accounting fees paid upon invoicing. |

Counsel for the Debtor has reviewed each of the above-referenced transfers and has concluded that most of the transfers are not subject to avoidance as preferential transfers, based on likely asserted defenses, and that none of the transfers have the components necessary to assert avoidance as fraudulent conveyances, whether intentional or constructive. At most, providing the full benefit of doubt in favor of a hypothetical chapter 7 trustee, counsel has concluded that part or all of the transfers in items 9, 11, 19, 23, 45 and 46 may be preferential, **if** any available defenses, such as ordinary course, subsequent new value or priority status, can be overcome. Counsel expresses no opinion as to such defenses. Those transfers, assuming no valid defenses, would be in the aggregate preferential amount of $76,473.62.

Assuming that the chapter 7 trustee pursued all such preference claims successfully, he/she would incur legal costs in doing so, and in all likelihood would reach settlements with some or all prospective defendants by discounting recoveries. As a result, actual net recoveries would be significantly less than the gross amount of asserted preference claims, even if no applicable defenses prevailed. Solely as a reference point, therefore, it is estimated that those net recoveries would be no greater than $50,000.00, and probably less.

The opinions or conclusions expressed herein are estimations and, to some extent, speculative. They cannot be relied upon for any purpose other than to provide a general sense of likely, hypothetical recoveries, which would necessarily differ, perhaps materially, from those estimated herein.

# EXHIBIT "D"

# LIQUIDATION ANALYSIS

(All amounts based on estimations and projections by the Debtor's management
without independent analysis or investigation, as of February 28, 2024)

Estate Assets:

| Description | Estimated Amount (+) | Comment |
|---|---:|---|
| Cash | 89,700 | Estimated based on projections of cash flow |
| Malting Machines, including related IP | 2,850,000 | Estimated net liquidation value[1] |
| Other Equipment | 152,500 | Estimated net liquidation value |
| Accounts Receivable | 9,700 | Likely uncollectible |
| Grain Inventory | 88,100 | Estimated net liquidation value[2] |
| Preference Claims, net recovery | 50,000 | See Exhibit "D" |
| TOTAL: | 3,240,000 | |

Estate Liabilities:

| Description | Estimated Amount (-) | Cumulative Balance |
|---|---:|---:|
| Secured Claims[3] | 3,190,000 | 50,000 |
| Chapter 7 Trustee's Estimated Fees/Costs | 5,000 | 45,000 |
| Chapter 7 Professionals' Estimated Fees/Costs | 10,000 | 35,000 |
| Chapter 11 Debtor's Professionals' Unpaid Fees/Costs | 125,000 | 0 |
| Priority Claims | 10,000 | 0 |
| NET FUNDS AVAILABLE FOR CLASS C CLAIMANTS | 0 | 0 |

---

[1] Based on the following assumptions regarding sale of malting machines: (a) pilot machine gross price of $250,000, machines 1-4 gross price of $300,000, machines 5-6 gross price of $350,000, machines 8-9 gross price of $400,000, and unfinished machine 9 gross price of $50,000; and (b) removal costs of $15,000 per machine.

[2] Based on the following assumptions regarding grain inventory: (a) 1,215 tons of raw grain and 253 tons of malt, of which 80% remains sellable; (b) sale price of $100, less loading costs of $25, per ton; and (c) net proceeds of $88,072.

[3] Secured Claims held by Evan S. Turner and Local Invest Fund I, LLC are secured by essentially all assets of the Debtor other than preference claims. As of the Petition Date, the aggregate amount of those Claims was in excess of $5,000,000. However, for purposes of this analysis it is assumed that the secured portion is limited to the lesser value of its collateral – all assets other than preference claims.

1

32957_2.DOC

Entered on Docket October 30, 2023        **Below is the Order of the Court.**



**Timothy W. Dore**
**U.S. Bankruptcy Court**
**(Dated as of Entered on Docket date above)**

TIMOTHY W. DORE
United States Bankruptcy Judge
700 Stewart Street, Room 8106
Seattle, WA 98101
(206) 370-5300

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| In re: | Case No. 23-12026-TWD |
| SALISH COAST ENTERPRISES INC., | **CASE MANAGEMENT ORDER** |
| Debtor. | |

THIS MATTER came before the Court on the Debtor's Motion for Entry of Case Management Order [Docket No. 8] ("Motion"). The Court held a hearing on the Motion on October 27, 2023. No further notice or opportunity for hearing is necessary. The relief to be granted in this Order is reasonable, appropriate, and in the best interests of the estate.

It is ORDERED that:

1.        With respect to all matters which the Bankruptcy Court, the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), or the Local Bankruptcy Rules authorize the Court to designate or limit the parties entitled to notice, notice shall be deemed appropriate under the particular circumstances presented if served only upon the following parties:

CASE MANAGEMENT ORDER - 1

a.      The Debtor and its counsel;

b.      The Office of the United States Trustee, through counsel;

c.      Secured lenders Evan Turner and Local Invest Fund I, LLC;

d.      The Washington State Attorney General; and

e.      The 20 largest unsecured creditors, as shown on the list filed by the Debtor on October 20, 2023 [Docket No. 1].

The entities and individuals listed above shall comprise the "Special Notice List".

2.      In addition to the Special Notice List, notice shall be sent to any party against whom direct relief is sought by motion, application or otherwise, including by way of examples and not limitation, the non-debtor party to an executory contract being assumed or rejected, and parties asserting an interest in property being sold.

3.      In addition to the Special Notice List, all notices with respect to the Debtor's anticipated plan of reorganization shall be sent to all parties who have filed a timely proof of claim or are listed as claimants in the Debtor's schedules as noncontingent, undisputed and liquidated.

4.      The Court reserves the right to modify the provisions of this Order on its own motion or on the motion of any party-in-interest.

5.      This Order shall not be construed to limit notices required to be sent to all creditors under Bankruptcy Rules 2002(a)(1), 2002(a)(4), 2002(a)(6), and 2002(f).

6.      Nothing in this Order shall be construed to prejudice the rights of any party-in-interest to (a) move the Court to further limit or expand notice upon a showing of good cause including, but not limited to, the right to file a motion seeking ex parte consideration, or consideration upon shortened time; or (b) seek an enlargement or reduction of a time period as provided in Bankruptcy Rules 9006(b) and (c).

7.      Within seven days following entry of this Order, the Debtor shall mail a copy of this Order to all parties listed on the official mailing matrix together with a notice informing parties that if they want to receive all notices in this case, they must make a written request addressed to Kathy Quon

CASE MANAGEMENT ORDER - 2

Bryant via either email to kquonbryant@meyerslawgroup.com or U.S. mail to Meyers Law Group, P.C., 100 Shoreline Highway, Suite B160, Mill Valley, California 94941. Upon receipt of such a request, the Debtor shall add the requesting party to the Special Notice List.

8. Notwithstanding any provision to the contrary herein, service via ECF upon counsel of record for any of the parties identified herein pursuant to applicable rules or orders of this Court shall constitute adequate notice for purposes of this Order.

9. The Debtor shall maintain the Special Notice List and make it available upon request of any party-in-interest.

/ / / End of Order / / /

CASE MANAGEMENT ORDER - 3

**LOCAL INVEST FUND I, LLC'S AND EVAN TURNER'S LETTER IN SUPPORT OF PLAN OF LIQUIDATION**

To:     All Holders of Voting Claims

RE:     SALISH COAST ENTERPRISES, INC.
          Case No. 23-12026
          United States Bankruptcy Court, Western District of Washington

Dear Voting Creditor:

On October 20, 2023, Salish Coast Enterprises, Inc., dba Skagit Valley Malting ("SVM"), filed its voluntary petition under chapter 11 of the United States Bankruptcy Code.

SVM was originally founded in 2011. The company operated a grain processing business whereby it produced malt which was, in turn, sold to craft brewing and craft distilling companies along the west coast of the United States and Canada. SVM used locally sourced grains purchased from area farmers and producers. Unfortunately, the COVID-19 pandemic had severe impacts on the finances of the company and it was ultimately forced to shutter all operations in June 2023.

In 2019, Evan Turner ("Turner"), agreed to provide a secured credit facility to SVM. The original credit facility was $2,000,000.00. The credit facility was amended several times, increasing the facility to $3,000,000.00 and adjusting interest and maturity dates. At the time of filing, the loan balance was $3,181,726.73. The credit facility was secured by seven malting machines owned by SVM.

In December 2022, Local Invest Fund, I, LLC[1] ("Local Invest") extended an additional secured credit facility to SVM in the amount of $1,000,000. The Local Invest credit facility was secured by substantially all of the assets of SVM other than certain malting machines and intellectual property. At the time of filing, the loan balance was $673,210.08.

Since the case was filed Turner and Local Invest have worked with SVM in order to find the best path forward that would permit the malting ventures to restart. Toward that goal, Turner and Local Invest have consented to the use of cash collateral to maintain the assets of SVM. Ultimately Turner and Local Invest determined that the best path forward for all parties involved was if they purchased substantially all of the assets of SVM that would allow the malting business to restart in a manner that would provide economic development to the Port of Skagit and the local and regional partners who had provided goods and services to SVM. Turner, Local Invest and SVM have reached an agreement on the purchase of the assets, the terms of which are set forth in the *Debtor's Plan of Liquidation* filed on March 25, 2024 (the "Plan"). Turner and Local Invest have agreed to the terms of the Plan (as well as any mutually acceptable amendments thereto) and will accept and perform their obligations thereunder in the event of its confirmation and effectuation.

---

[1] Evan Turner is the Manager of Local Invest Fund, I, LLC.

In exchange for substantially all of the assets of SVM, Turner and Local Invest, through an entity to be created by them, shall pay the allowed secured claim of Innotech, all cure payments, if any, to any executory contract holder whose executory contract is being assumed, all allowed administrative expenses of the bankruptcy estate (less any cash that remains in the estate on the Effective Date of the Plan), all outstanding and unpaid United States Trustee Fees, and a payment of $20,000 that will be distributed to allowed unsecured creditors.[1] In addition, Turner and Local Invest have negotiated a new lease with the Port of Skagit that results in a full release of the Port of Skagit's unpaid pre-petition and post-petition rents and a full release of its general unsecured claim for the remaining balance due under the lease, thus increasing the distribution to all other unsecured creditors.

Turner and Local Invest have taken significant steps towards restarting the malting business once the Plan is confirmed and the above sale has closed. Turner and Local Invest have identified a new Malter who they intend to retain once the sale has closed. They have reached out to former producers and vendors to continue the tradition of purchasing grains from local sourced producers. They have negotiated the lease with the Port of Skagit in order to bring needed rental income to the Port's constituents.

In the event that the Plan is not approved, it is likely that the bankruptcy case will be dismissed or converted to Chapter 7. In that scenario, Turner and Local Invest will foreclose on their security interests and all other creditors, lease holders and vendors will receive nothing.

**Under the facts and circumstances of this case, the proposed sale outlined in the Plan is in the best interests of the bankruptcy estate and its creditors and Turner and Local Invest recommend that you vote to APPROVE the Plan. Notwithstanding this recommendation, you must make your own independent determination as to whether the Plan is acceptable to you and should consult your own legal and/or financial advisor(s).**

Dated this 25th day of March, 2024.

_____
Evan Turner

_____
Local Invest Fund I, LLC
By Evan Turner, Its Manager



March 25, 2024

Mr. Dave Green
Skagit Valley Malting
11966 Westar Lane
Burlington, WA 98233

Re:     Salish Coast Enterprises, Inc., dba Skagit Valley Malting – Debtor's Plan of Liquidation

Dear Mr. Green,

I write in reference to the Debtor's Plan of Liquidation (the "Plan") filed by Salish Coast Enterprises, Inc., dba Skagit Valley Malting ("SVM") in SVM's pending chapter 11 case, no. 23-12026-TWD on March 25, 2024.

The Port of Skagit the ("Port") has reviewed the Plan and its proposed treatment of the Port's claims and leases, and based on that review and other considerations, the Port confirms that it has agreed to the terms of the Plan (as well as any amendments thereto that do not materially and adversely affect its interests) and will consent to, accept and perform its obligations thereunder in the event of its confirmation and effectuation.

Sincerely,

Sara K. Young
Executive Director

cc:     Todd Egland, CSD Attorneys at Law

Real Estate          Airport Services          Marine Services          Community Initiatives

Administrative Offices / Airport    15400 Airport Drive, Burlington, WA 98233 | phone 360-757-0011 | fax 360-757-0014 | www.portofskagit.com
La Conner Marina    613 North 2nd Street, P.O. Box 1120, La Conner, WA 98257 | phone 360-466-3118 | fax 360-466-3119
Case 23-12026-TWD    Doc 81    Filed 03/25/24    Ent. 03/25/24 11:10:23    Pg. 37 of 37